UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEFFREY REICHERT, individually and
on behalf of all others similarly situated,

          Plaintiff,

    v.

KEEFE COMMISSARY NETWORK,
L.L.C., d/b/a ACCESS
CORRECTIONS; RAPID
INVESTMENTS, INC., d/b/a RAPID
FINANCIAL SOLUTIONS, d/b/a
ACCESS FREDOM; and CACHE
VALLEY BANK,

          Defendant.

CASE NO. 3:17-cv-05848-RBL

ORDER ON MOTION FOR CLASS
CERTIFICATION

## INTRODUCTION

THIS MATTER is before the Court on Plaintiff Jeffrey Reichert's Motion for Class

Certification. Dkt. #69. This class action lawsuit challenges the use of prepaid "release cards" for

reimbursing confiscated cash to inmates as they are released from incarceration. Many

government facilities have opted to use these cards instead of redistributing funds via cash or a

check. However, unlike those other methods, release cards carry hefty fees that start depleting

inmates' funds within hours of release. Defendant Keefe Commissary Network, L.L.C., contracts

1  with government agencies to provide release cards, which are managed by Defendant Rapid

2  Investments, Inc., and issued by Cache Valley Bank.

3      Reichert moves to certify both a national class, asserting claims under the Electronic

4  Funds Transfer Act (EFTA), and a Washington subclass, asserting claims under EFTA, the

5  Takings Clause, and the Washington Consumer Protection Act (WCPA), as well as for

6  conversion and unjust enrichment. In his Reply, Reichert also wishes to amend the class

7  definitions to include only inmates who were not offered a choice between receiving a release

8  card or some other form of reimbursement.

9      Reichert argues that class certification is appropriate because Rule 23(a)'s four

10  requirements of numerosity, typicality, commonality, and adequacy are satisfied. Reichert also

11  contends that Rule 23(b)(3)'s predominance requirement is met because the central questions in

12  this case focus on the practice of providing inmates with activated, fee-laden cards instead of a

13  check or cash. Finally, Reichert argues that a class action is the superior method of bringing

14  these claims because individual actions would not be financially feasible and the class definitions

15  are based on objective criteria.

16      Defendants contest certification on a number of bases but primarily focus on typicality

17  and predominance. Defendants argue that Reichert is not typical of all class members because

18  many facilities provide inmates with a copy of Rapid's cardholder agreement when they are

19  released, creating potential contractual defenses. Defendants contend that the possibility that

20  some class members formed contracts upon release will raise numerous questions about the

21  circumstances of each inmates' release, which would vary according to the procedures at each

22  facility. Defendants also argue that a national class would be unmanageable in light of the vast

23  amount of evidence and witnesses in other states. Finally, Defendants assert that the government

24

entities that contract with Defendants are necessary parties under Rule 19 but that they cannot be feasibly joined because the Court lacks personal jurisdiction over agencies in other states.

For the following reasons, the Court conditionally GRANTS in part Reichert's Motion.

## BACKGROUND

**1.      The Use of Release Cards to Distribute Inmates' Funds**

Defendant Keefe Commissary Network, LLC, contracts with numerous government agencies to provide hardware and software for managing inmates' money during incarceration. Manning Dec., Dkt. #76, at 2. One such service is the use of release cards, which allow facilities to disperse any money in an inmate's account on a prepaid card. *Id*. An inmate's account may contain cash that was confiscated when the inmate was originally booked or other funds deposited for use while incarcerated. *Id*. at 2-3. Keefe estimates that it contracts with around 25 government agencies in Washington and over 700 agencies nationwide. *Id*. at 3.

However, unlike reimbursing inmates via cash or a check, release cards come with a schedule of fees. In addition to ATM and transfer fees, inmates are also charged "weekly maintenance fees." Youtz, Dec., Dkt. #71, Exs. 2-4. The first of these maintenance fees is incurred 36 or 72 hours after the card is issued. *Id*. Keefe represents that inmates may avoid fees altogether if they quickly withdraw their funds from a MoneyPass ATM or get cash back. Dkt. #76, at 2. However, because the cards are issued before an inmate actually receives them, it is unclear how long inmates have to do this.

To provide release cards, Keefe contracts with yet another company—Rapid Investments, Inc. Jackson Dec., Dkt. #78, at 1. Rapid manages the prepaid cards and provides them to government facilities. *Id*. at 2. Rapid also contracts with Cache Valley Bank, which issues the cards, and MasterCard, which sponsors the payment network. *Id*. Rapid's release cards are paired

with a cardholder agreement containing, among other things, yet another fee schedule and an arbitration provision. *Id.*, Ex. 2. Rapid states that it now attaches all its cards to a carrier with the agreement but does not control if and how facilities provide inmates with a copy of the agreement. *Id.* at 2-3.

While government facilities may offer inmates a release card as their sole means of reimbursement, Keefe's standard contract does not appear to require this. Dkt. #71, Exs. 2-4. Keefe represents that government agencies have sole discretion for determining their release procedures and that some opt to give inmates a choice between a release card, a check, or cash. Dkt. #76, at 3. Rapid states that it has no knowledge of whether government entities offer inmates options for reimbursement. Dkt. #78, at 2.

**2.      Plaintiff Reichert's Experience at the Kitsap County Jail**

On October 21, 2016, Reichert was arrested by the Kitsap County Sheriff's Department on suspicion of driving under the influence of alcohol. Reichert Dec., Dkt. #70, at 2. During booking, Reichert's wallet containing $176.77 in cash was confiscated. *Id.* at 2. Reichert was taken to the Kitsap County Jail at 12:30 a.m. on October 22 and released four hours later. *Id.* Instead of returning his cash, Kitsap County gave Reichert a prepaid release card loaded with $176.77. *Id.* Jail staff offered Reichert no alternate means for recovering his cash. *Id.* Reichert also received no warnings or documentation regarding the card, although Kitsap County states that it displays the cardholder terms and conditions paperwork prominently next to the release elevator. *Id.*; Thurmon Dec., Dkt. # 75, at 3.

On November 2, Reichert went to an ATM to withdraw cash using his release card. *Id.* He withdrew $160 but was unable to take out as much money as he thought, so he contacted Rapid to inquire about his account balance. *Id.* at 3. Rapid sent Reichert an email showing his

account activity, which included two $2.50 "periodic maintenance fees" on October 25 and November 1, and two "issuer fees" on November 2 when he used the ATM. Dkt. #70, Ex. 1. By November 8, the remaining $7.32 in his account had been depleted through various other fees. *Id*.

### 3.    Procedural History and Class Definitions

Reichert filed his class action complaint on October 20, 2017. Dkt. #1. On February 2, 2018, all three Defendants moved to compel arbitration, citing the cardholder agreement for the release cards offered by Rapid. Dkt. ## 36 & 40. The Court denied the motions on the basis that Reichert never affirmatively chose to be reimbursed with a card, eliminating the potential for mutual assent under Washington law. *Id*. at 4-5.

During the discovery process, Reichert propounded a number of requests for documents related to Defendants' agreements and communications with government entities. Second Youtz Dec., Dkt. #86, Ex. 5-6. Defendants apparently refused to produce documents concerning government entities other than Kitsap County. *Id*. Defendants objected on multiple grounds, but one basis was that the request was premature because such documents were not required to decide class certification. *Id*.

Reichert moved to certify on January 18, 2019, and Defendants' opposition briefs featured arguments about the different procedures for releasing inmates at facilities other than Kitsap. Dkt. ## 69, 74, & 77. Specifically, Defendants state that some facilities offer inmates a choice between receiving a card and another form of reimbursement, such as a check. Reichert replied by amending the class definitions to focus only on inmates that were not given an option about how their money was distributed. Dkt. #85, at 5. The national class definition now reads as follows:

All persons in the United States who, at any time since October 20, 2016, were: (1) taken into custody at a jail, correctional facility, detainment center, or any other law enforcement facility, (2) entitled to the return of money either confiscated from them or remaining in their inmate accounts when they were released from the facility, (3) issued a prepaid debit card from Keefe Commissary Network, LLC, Rapid Investments, Inc., and/or Cache Valley Bank that was subject to fees, charges, and restrictions and (4) not offered an alternative method for the return of their money.

*Id*. For the Washington subclass, Reichert proposes the following definition:

All persons who, at any time since October 20, 2013, were: (1) taken into custody at a jail, correctional facility, detainment center, or any other law enforcement facility located in the state of Washington, (2) entitled to the return of money either confiscated from them or remaining in their inmate accounts when they were released from the facility, (3) issued a prepaid debit card from Keefe Commissary Network, LLC, Rapid Investments, Inc., and/or Cache Valley Bank that was subject to fees, charges, and restrictions and (4) not offered an alternative method for the return of their money.

## DISCUSSION

A party seeking to certify a class must demonstrate that it has met all four requirements of Federal Rule of Civil Procedure 23(a) (numerosity, commonality, typicality, and adequacy) and at least one of the requirements of Rule 23(b). Under Rule 23(a), members of a class may sue or be sued as representative parties only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a) (emphasis added).

Rule 23(b) provides for the maintenance of several different types of class actions. Fed. R. Civ. P. 23(b). Reichert seeks to certify the proposed classes under Rule 23(b)(3). A class can be certified under this rule if a court finds both that common questions of law or fact "predominate" over individual questions and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

**1.     Amendment of the Class Definitions**

"Where appropriate, the district court may redefine the class." *Armstrong v. Davis*, 275 F.3d 849, 872 n.28 (9th Cir. 2001); *see also Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 467 (9th Cir. 1987). However, courts are divided over whether a plaintiff must amend their complaint in order to amend the class definition. *See J.L. v. Cissna*, No. 18-CV-04914-NC, 2019 WL 415579, at *5 (N.D. Cal. Feb. 1, 2019) (collecting cases). Some courts only allow a plaintiff to modify the class definition at certification if the "proposed modifications are minor, require no additional discovery, and cause no prejudice to defendants." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 590–91 (N.D. Cal. 2010).

Under these circumstances, it is appropriate to allow Reichert to redefine the class. The modification would not add a "wholly different group of people" to the case. *See Cissna*, WL 415579, at *5 (discussing *Berlowitz v. Nob Hill Masonic Mgmt.*, No. 96-cv-01241-MHP, 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996)). Instead, it would actually narrow the class definition by excluding inmates who were offered a choice between methods of reimbursement. To the extent the narrowed class definition would require discovery about which facilities offer inmates a choice, Defendants have already refused to respond to discovery requests on this subject. *See* Dkt. #86, Ex. 5-6. Reichert's is permitted to amend the class definition.

### 2.     Numerosity

The numerosity requirement is met when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no threshold number of class members that automatically satisfies this requirement," but 40 is generally an adequate number. *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1326–27 (W.D. Wash. 2015); *see also Wamboldt v. Safety–Kleen Sys., Inc.*, No. C 07–0884 PJH, 2007 WL 2409200, at *11 (N.D.Cal. Aug. 21, 2007).

Here, numerosity is easily satisfied. Defendants' discovery responses indicate that Kitsap County alone has issued thousands of release cards in the past several years. While Defendants refused to divulge the number of cards issued by other agencies, one can only imagine that the numbers are vast.

### 3.     Typicality and Adequacy

"[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon, 150 F.3d at 1020*. This requirement "ensures that 'the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Gold v. Midland Credit Management, Inc.*, 306 F.R.D. 623, 631 (N.D. Cal. 2014) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n. 13 (1982)). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992). Courts consider "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* at 508.

The typicality and adequacy of representation analyses tend to "merge" in many respects. *Amchem*, 521 U.S. at 626 n.20. Adequacy concerns whether the representative will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir.2011) (quoting Hanlon, 150 F.3d at 1020).

Here, the facts underlying Reichert's claims are sufficiently typical of the class. Like other class members, Reichert had his money put into an account controlled by Defendants, was given an activated prepaid card upon release, and incurred fees before attempting to withdraw money. While some class members may not have incurred the same fees, Reichert's injury is of the same type and issued from the same source as the rest of the class. Plaintiff's counsel is adequate and has handled numerous class actions, including actions involving prisoners, and has no apparent conflicts with the class. Dkt. #71, at 2-5. Reichert has also stated that he will diligently represent the interests of other class members and is unaware of any conflicts.

Defendants argue that Reichert is atypical and inadequate because he did not receive a cardholder agreement at the Kitsap facility, while other class members may have agreed to arbitration by using their card after receiving an agreement. Several courts have discussed whether the typicality and adequacy requirements are satisfied where the class representative did not enter an arbitration agreement but other members may have. *Nitsch v. Dreamworks Animation SKG Inc.*, for example, held that the class representative was still sufficiently typical because "the fact that 'some potential class members are unlikely to recover because of a unique

defense' is 'not relevant to typicality.'" 315 F.R.D. 270, 284 (N.D. Cal. 2016) (quoting *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 117 (C.D.Cal.2007)). The court explained that a representative is typical as long as they are not "subject to unique defenses which threaten to become the focus of the litigation." *Id.* (quoting *Hanon*, 976 F.2d at 508). In contrast, *Conde v. Open Door Marketing, LLC* reached the opposite result in similar circumstances. 223 F. Supp. 3d 949, 960 (N.D. Cal. 2017). There, the court held that adequacy and typicality were not satisfied because the named plaintiffs were not "personally affected by the arbitration agreements" and thus could not "challenge the agreements on behalf of individuals who did sign." *Id.*

Similar to *Conde*, Reichert will not be able to adequately represent the interests of class members who actually received a cardholder agreement. Defendants have provided reason to believe such class members exist and have indicated that they will try to compel arbitration. Because he was never given a cardholder agreement and has already succeeded against Defendants' attempts to compel arbitration, Reichert cannot challenge the formation or enforceability of other members' agreements.

Luckily, this is a fairly easy fix. Rule 15 allows a party to amend their pleadings, and Rule 21 provides that, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Courts routinely allow the addition of new named plaintiffs in class actions where it will "provide the court with both a broader and a more representative sample of factual situations relating to the class allegations in th[e] action." *Morgan v. Laborers Pension Tr. Fund for N. California*, 81 F.R.D. 669, 673 (N.D. Cal. 1979); *see also Palmer v. Stassinos*, 236 F.R.D. 460, 464 (N.D. Cal. 2006); *Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05 CIV. 3452 RJHRLE, 2006 WL 1049352, at *2 (S.D.N.Y. Apr. 19, 2006). Consequently, class certification will be

conditioned on Reichert adding at least one named plaintiff who was given a cardholder agreement with his release card.[1]

Defendants also insist that Reichert is not typical of class members who actually read the agreement and were thus aware of Defendants' "offer" to arbitrate claims. Dkt. #77, at 7. Typicality is not undone on this basis. Defendants present no evidence beyond their own speculation that some inmates knew of the fees or arbitration provision before using the card. *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 184 (N.D. Cal. 2015) ("There is no evidence or even suggestion that any class representative or member signed an agreement with the Defendants compelling arbitration of their claims."). Even if some class members were subjectively aware of the agreement's terms, such a unique defense would not defeat certification. *See Nitsch*, 315 F.R.D. at 284.

Defendants also contend that Reichert's claims, which stem from his involuntary surrender of cash, make him fundamentally different from class members who chose to deposit money into their inmate trust account. According to Defendants, voluntary deposits necessarily subject the inmate to the facility's terms and conditions for distribution of the funds. But Defendants gloss over the fact that inmates have no other means of using funds while in prison, making the "voluntariness" of a deposit not so different from when cash is confiscated. Unless inmates who deposit money receive additional notifications or agree to certain terms regarding redistribution of their money, it is unclear how the analysis for any claims differs based on where the money originated. Defendants may come up with additional evidence or arguments

---

[1] In at least one case challenging inmate release cards, the plaintiff signed an acknowledgement form showing that they chose to receive a card. *See Pope v. EZ Card & Kiosk LLC*, No. 15-61046-CIV, 2015 WL 5308852, at *3 (S.D. Fla. Sept. 11, 2015). However, class members in this case were not given an option for how they received their money and Defendants do not identify a policy of encouraging clients to require signatures. The sample cardholder agreement provided by Rapid also does not seem to contain a signature line. Consequently, absent additional evidence, Reichert need not add a named plaintiff who signed an agreement or acknowledgement.

1   indicating that the class definition should be amended, but they have not done this so far.

2   Reichert is thus not atypical on this basis.

3          Finally, Defendants argue that Reichert cannot adequately represent all class members

4   because some inmates may prefer a card to other forms of reimbursement, creating an intra-class

5   conflict. It is true that "a class cannot be certified when its members have opposing interests or

6   when it consists of members who benefit from the same acts alleged to be harmful to other

7   members of the class." *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247

8   F.R.D. 156, 177 (C.D. Cal. 2007) (quoting *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280

9   (11th Cir.2000)). However, this is not a case where "some class members derive a net economic

10  benefit from the very same conduct alleged to be wrongful by the named representatives of the

11  class." *Id*. While Defendants imply that the wrongful conduct at issue is reimbursing inmates via

12  *any* type of card, Reichert is only challenging the use of activated, fee-laden cards. It is difficult

13  to imagine how some class members benefit economically by paying a fee. While it is possible

14  that the result of this lawsuit may cause Defendants or government agencies to discontinue the

15  use of release cards altogether, there is a chance of something similar in most consumer class

16  actions. The fact that this possibility may be against the wishes of some class members does not

17  mean there is an intra-class conflict.

18  **4.      Predominance of Common Questions over Individual Questions**

19         To satisfy Rule 23(a)'s "common question of law or fact" requirement, the plaintiffs'

20  claims must "depend upon a common contention" that is "capable of classwide resolution." *Wal-*

21  *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The key question is whether a "classwide

22  proceeding [will] generate common answers apt to drive the resolution of the litigation." *Id*. In a

23  However, the commonality requirement is "subsumed under, or superseded by, the more

24

stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). The Court will thus consider the principles guiding (a)(2) commonality in the predominance analysis but resolve both requirements in one stroke.

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Common questions are defined by the plaintiffs' ability to make a prima facie showing using the same evidence. *Id.* "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (internal quotations omitted); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("[D]ifferences in damage calculations do not defeat class certification."). However, "[i]f the plaintiffs cannot prove that damages resulted from the defendant's conduct, then the plaintiffs cannot establish predominance." *Vaquero v. Ashley Furniture Indus.*, Inc., 824 F.3d 1150, 1154 (9th Cir. 2016).

When considering whether common issues predominate, the court should begin with "the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). In addition, "more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).

*a. Defenses Dependent on Contract Formation*

The Court has already denied Defendants' motions to compel arbitration with respect to Reichert. However, Defendants argue that individualized questions still predominate for both classes because other potential class members may have formed valid arbitration agreements under the unique circumstances of their release. Defendants assert that contract formation would bear on the analysis of each claim as well—unjust enrichment, for example, would be totally barred by the existence of a contract. Because facilities have different procedures for releasing inmates, and because contract law varies by state, Defendants argue that certification is not proper. Reichert responds that contracts could not have been formed as a matter of law when inmates were given no options for how their money was distributed.

*Lozano v. AT & T Wireless Services, Inc.* established that a district court may deny certification where it appears that an affirmative defense will likely require overwhelming state-by-state legal analysis. 504 F.3d 718, 728 (9th Cir. 2007) (arbitration defense would require analyzing unconscionability under the law of all 50 states). Thus, while the fact that some class members may have signed arbitration agreements does not automatically defeat certification, it can do so when complex factual or legal analysis will be necessary. *See Conde v. Sensa*, No. 14-CV-51 JLS WVG, 2018 WL 4297056, at *10 (S.D. Cal. Sept. 10, 2018). It is the plaintiff's burden at the certification stage to show that state-by-state legal variations are manageable. *Lozano*, 504 F.3d at 728; *see also Zaldivar v. T-Mobile USA, Inc.*, No. C07-1695RAJ, 2008 WL 11344661, at *2 (W.D. Wash. June 19, 2008).

Here, in light of the amended class definition, it seems unlikely that arbitration agreements could be formed under the law of any state. Even if an inmate was given a cardholder agreement upon release, the fact that Defendants controlled their account and their only option

for reimbursement was a card likely precludes acceptance or constitutes duress or procedural

unconscionability. However, Reichert has not provided a detailed legal explanation of why this

would be the case under the law of every state in the nation. *See Humphrey v. Stored Value*

*Cards*, 355 F. Supp. 3d 638, 645 (N.D. Ohio 2019) (relying on state-specific law to address

contract formation in a case involving release cards issued to inmates); *Regan v. Stored Value*

*Cards, Inc.*, 85 F. Supp. 3d 1357, 1362-64 (N.D. Ga.) (same); *Brown v. Stored Value Cards, Inc.*,

No. 3:15-CV-01370-MO, 2016 WL 755625, at *2 (D. Or. Feb. 25, 2016) (same). Rather than

certify the class, the Court will hold oral argument on whether state law is sufficiently consistent

for the Court to address the issue of contract formation for the national class.

Defenses related to contract formation do not pose a substantial barrier for the

Washington subclass. While the national class involves many different states' laws and

significantly more agencies' procedures for releasing inmates, the Washington subclass

implicates only one source of law and far fewer agencies. Indeed, Defendants have only

identified a few potential variations in release procedures, including providing inmates with an

agreement affixed to the card, giving inmates an agreement with the card, or placing the

agreement in a conspicuous location. Dkt. #74, at 6. Given this limited universe of facts, the

question of whether a contract can be formed when an inmate was given an agreement but was

not offered alternatives for reimbursement will produce a common answer. If the answer is

"yes," decertification or amending the class definition may be in order. *See* Fed. R. Civ. P.

26(c)(1)(C). However, this mere possibility does not defeat predominance.

Defendants further suggest that some inmates who received an agreement may have

actually *read it*, making them aware that using the card binds them to its terms. However,

Defendants have provided no evidence of this and the Court finds it unlikely for a number of

1 reasons—for one thing, inmates leaving incarceration are likely distracted and unprepared to put

2 on their spectacles and read the fine-print arbitration clause in Rapid's cardholder agreement. *See*

3 Dkt. #78, Ex. 2. Where Defendants rely on a "bare argument and speculation without any

4 supporting evidence," class certification is not defeated. *See Toney v. Quality Res., Inc.*, 323

5 F.R.D. 567, 589 n.20 (N.D. Ill. 2018) (holding that common questions predominated where the

6 defendants suggested that some class members may have read the terms on their website);

7 *Sateriale v. RJ Reynolds Tobacco Co.*, No. 2:09-CV-08394-CAS, 2014 WL 7338877, at *9 (C.D.

8 Cal. Dec. 19, 2014) (rejecting defendant's argument that individualized understanding of terms

9 defeated predominance). Defenses related to contract formation thus do not create too many

10 individual questions for the Washington subclass.

11 b.     *EFTA Claims*

12       Common questions predominate for Reichert's EFTA claims. Reichert first alleges that

13 Defendants violated 15 U.S.C. § 1693l-1(b)(2) & (3), which prohibit inactivity fees on prepaid

14 cards unless certain disclosure requirements are met. Reichert also invokes § 1693i, which

15 provides, "No person may issue to a consumer any card, code, or other means of access to such

16 consumer's account for the purpose of initiating an electronic fund transfer other than (1) in

17 response to a request or application therefor; or (2) as a renewal of, or in substitution for, an

18 accepted card, code, or other means of access, whether issued by the initial issuer or a

19 successor."

20       Reichert's § 1693i claim is almost entirely resolvable by determining whether

21 transferring an inmate's funds to a card and activating it before their release violates EFTA.

22 Deciding whether the § 1693l-1(b)(3) disclosure requirements are met will also largely center on

23 the notices on the cards themselves and accompanying documentation. While Defendants argue

24

that the procedures for providing inmates with cards vary between facilities, § 1693l-1(b)(3)(A) contains specific disclosure requirements for the card itself, regardless of what the vendor tells consumers. Agencies' different procedures for dispersing cards thus do not create too many individual questions.

c.    *Takings Claim*

Reichert's takings claim also lends itself to common questions. "The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation." *Ward v. Ryan*, 623 F.3d 807, 810 (9th Cir. 2010). "To establish a violation of the Takings Clause, [a plaintiff] must first demonstrate he has a property interest that is constitutionally protected." *Id.* A classic, or *per se*, taking occurs when "the government directly appropriates or physically invades private property." *United States v. King Mountain Tobacco Co.*, 131 F. Supp. 3d 1088, 1091 (E.D. Wash. 2015) (citing *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)). A regulatory takings involves "government regulation [that] proves to be 'so onerous that its effect is tantamount to a direct appropriation or ouster . . . .'" *Id.* (citing *Lingle*, 544 U.S. at 537). A fee charged by the government may be classified as a regulatory taking unless it is a "fair approximation of the cost of benefits supplied." *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989).

Here, the Complaint pleads a regulatory takings theory, alleging that the fees associated with the release cards do not bear a sufficient relationship with the value they impart. Dkt. #1, at 23. Whether class members have a property interest in the funds in their accounts and whether Defendants functioned as state actors are common questions. In addition, while Keefe seems to offer a variety of fee schedules to clients, the fees associated with Defendants' cards do not vary greatly—for example, all charge an ATM fee and a "weekly maintenance" fee that is incurred 36

or 72 hours after issuance. *See* Dkt. #71, Ex. 2-4. Consequently, whether the fees associated with Defendants' cards constitute a taking should be resolvable on a common basis.

Defendants argue that deciding if a taking occurred would require analyzing whether each transaction was voluntary and whether inmates entered into contracts. The Court has already explained why questions about contract formation are amenable to class-wide resolution. In addition, Defendants' argument about voluntariness raises a class-wide legal question of whether someone who is given no choice but to give up a property right may nonetheless "voluntarily" relinquish that right if they are given enough information. The one case cited by Defendants discusses voluntariness only in terms of whether or not the government's *demand* was mandatory. *See Bowles v. Willingham*, 321 U.S. 503, 517 (1944). Other cases are similar. *See, e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) (applicant's voluntary submission of data with awareness of terms in order to receive economic benefit was not taking); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2430 (2015) (requiring farmer to turn over part of crop in exchange for privilege of selling remaining crop was not voluntary exchange). If requiring reimbursement via a release card makes voluntariness impossible, the remaining question is whether Defendants may still be liable if agencies have discretion over the method of reimbursement. This too is a common question.

d.      *Unjust Enrichment and Conversion*

For similar reasons to the takings claim, common questions predominate for unjust enrichment and conversion. Washington law requires the following elements to prove unjust enrichment: "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wash. App. 474, 490 (2011).

"Conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." *Repin v. State*, 198 Wash. App. 243, 270 (2017). Whether transferring inmates' funds to fee-laden prepaid cards without their consent constitutes a benefit at the plaintiffs' expense is a common question that predominates for all class members. Similarly, it is a common question whether transferring inmates' funds to cards constitutes willful interference with chattel.

Defendants contend that determining if class members actually sustained injuries involves individualized questions because some members likely did not incur any fees at all. However, this issue is tantamount to a damages inquiry that can be addressed fairly easily for each class member by checking Defendants' records. *See* Dkt. #70, Ex. 1 (email from Rapid describing Reichert's account activity). Defendants also argue that the unjust enrichment claim would require individualized inquiries regarding whether each fee was justified. For the same reason that issues of contract formation are amenable to common answers, whether fees were justified also lends itself to generalized answers. *See Humphrey v. Stored Value Cards*, No. 1:18-CV-1050, 2018 WL 6011052, at *7 (N.D. Ohio Nov. 16, 2018) ("[T]he circumstances making Defendants' retention of bank card fees unjust are essentially uniform across the class."). Again, agencies' responsibility for imposing cards as the only option for inmates may impact Defendants' liability, but it does not affect predominance.

e.      *Washington Consumer Protection Act*

Finally, common questions also predominate for the WCPA claim. The elements of a WCPA claim are (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) that impacts the public interest; (4) causes injury to the Plaintiffs' business or property; and (5) involves a causal link between the practice and the injury. *Hangman Ridge Training Stables,*

*Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780 (1986). At least the first three elements of the claim can be resolved through common questions—namely, whether the practice of unilaterally transferring inmates' funds to an activated card with substantial fees is unfair or deceptive, occurs in trade or commerce, and impacts the public interest. To the extent procedures for providing cards may differ, Defendants have produced no evidence of some facilities providing additional warnings to inmates regarding fees. Defendants do state that Rapid instructs facilities provide the card with the agreement attached, but whether this practice is deceptive can be assessed on a class-wide basis.

The final two elements, injury and causation, also do not defeat predominance. While it is true that some inmates may not have been charged fees at all, the Ninth Circuit has recognized that injury is just one element of a WCPA claim that does not necessarily overwhelm the others. *See Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1135 (9th Cir. 2016). Causation will also not create overwhelming individual questions. Unlike cases where the plaintiff alleged material misrepresentation, Reichert's causation theory is that Defendants omitted the fact that inmates' money would be reimbursed through cards subject to fees. Dkt. #1, at 27. "A presumption of reliance is appropriate in fraud cases such as this one, where Plaintiffs have primarily alleged omissions, even though the Plaintiffs allege a mix of misstatements and omissions." *Grays Harbor Adventist Christian Sch. v. Carrier Corp.*, 242 F.R.D. 568, 573 (W.D. Wash. 2007); *see also Weidenhamer v. Expedia, Inc.*, No. C14-1239RAJ, 2015 WL 7157282, at *13 (W.D. Wash. Nov. 13, 2015). As previously stated, Defendants have not argued that some class members received additional warnings from specific government entities that may have impacted their use of a release card. Common questions therefore predominate.

## 5. Superiority of the Class Action

The superiority requirement focuses on whether a class action is the best method of dispute resolution in the particular case, and "necessarily involves a comparative evaluation of alternative mechanisms." *Hanlon*, 150 F.3d at 1023. Courts should consider the following factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

In the Ninth Circuit, administrative feasibility (what some courts call "ascertainability") is addressed as part of Rule 23(b)(3)(D)'s manageability requirement. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017). While a plaintiff need not demonstrate that a specific feasible method of identifying class members exists, *id.* at 1125, courts do generally consider whether the class is defined according to objective characteristics. *See, e.g., Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 623 (S.D. Cal. 2015). Nonetheless, denying certification solely on manageability grounds is disfavored. *Briseno*, 844 F.3d at 1128.

Here, the first and second factors advise in favor of certification. There is no indication that any inmates have an interest in pursuing their own claims—in fact, it would likely be uneconomical for them to do so. There is also no evidence that certain inmates have already initiated their own individual actions.

As for the desirability and feasibility of managing the class action in this forum, the Washington subclass does not pose serious problems. Reichert correctly points out that the criteria for identifying class members are objective and do not rely on the actions or beliefs of

particular inmates. Rather, it should be possible to identify potential class members once

Reichert obtains discovery on which Washington facilities only reimbursed inmates with a card.

*Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 673 (N.D. Cal. 2011) ("It is not fatal for a

class definition to require some inquiry into individual records, as long as the inquiry is not 'so

daunting as to make the class definition insufficient.'"). Although some records may well be in

the hands of the government entities, Reichert could access such documents via subpoena.

Obtaining this information for the national class could pose larger obstacles, but there is no

apparent reason why Reichert cannot manage that task.

Defendants argue that concentrating litigation in this forum would be problematic for the

national class because government witnesses and evidence would be located in far flung states.

However, Reichert's only remaining claims for the national class are under EFTA. Those claims

largely implicate only Defendants' practices, making evidence from individual government

agencies less essential. Defendants' affirmative defense of compelling arbitration will also

largely boil down to a single legal question of whether a contract can be formed under any state's

laws when inmates are not given a choice regarding how their money is reimbursed upon release.

**6.      Necessary Joinder of Third-Party Government Entities**

Defendants argue that Kitsap County (and presumably every other government entity

implicated by the class definition) must be joined as a necessary party under Rule 19, although

they do not explain why. Defendants also contend that failing to join absent government entities

would violate the due process rights of those parties. Defendants argue that this required joinder

bars certification of the national class because the Court cannot exercise personal jurisdiction

over government entities outside the state. Reichert responds that Defendants have not explained

how the outcome of this case will eliminate agencies' ability to issue release cards that comply

with the law. Reichert also argues that the Court could accord complete relief by ensuring that Defendants provide full disclosures and a voluntary choice to inmates in the future.

*a.     Rule 19 Joinder*

Rule 19(a)(1) requires joinder of a party (A) if the Court would not be able to "accord complete relief" in their absence or (B) if the party "claims an interest relating to the subject of the action" and resolving the case without them would impede their ability to protect that interest or subject an existing party to inconsistent obligations. Fed. R. Civ. P. 19(a). If the court finds that a party is necessary, it must determine whether joinder is feasible. *Id*. "If a person has not been joined as required, the court must order that the person be made a party." *Id*. The determination of whether a party must be joined under Rule 19 is "heavily influenced by the facts and circumstances of each case." *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 468 (9th Cir.1986).

The "complete relief" described in Rule 19(a)(1)(A) "'is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action.'" *Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir.2013) (quoting *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir.2004)). "To be 'complete,' relief must be 'meaningful relief *as between the parties*.'" *Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013) (quoting *Disabled Rights*, 375 F.3d at 879). As for Rule 19(a)(1)(B), "[a] public entity has an interest in a lawsuit that could result in the invalidation or modification of one of its ordinances, rules, regulations, or practices." *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1082 (9th Cir. 2010). A party to a contract also has an interest in a lawsuit "seeking to decimate that contract." *See Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002). However, joinder under Rule

19(a)(1)(B) is "contingent . . . upon an initial requirement that the absent party *claim* a legally protected interest relating to the subject matter of the action." *Ward v. Apple Inc.*, 791 F.3d 1041, 1051 (9th Cir. 2015) (quoting *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999)). An existing party may not obtain joinder simply by championing the interest of an absentee. *See In re Cty. of Orange*, 262 F.3d 1014, 1023 (9th Cir. 2001).[2]

Defendants only argue that Kitsap County's interests would be harmed if left out of this case, but the County itself has not asserted this interest despite being on notice of the case. *See* Dkt. #75 (declaration of Kitsap County employee filed in support of Defendants' opposition to certification). If a third party is aware of a case and has chosen not to claim their interest, it is not the Court's job to override that choice at the request of an existing party. *See Bowen*, 172 F.3d at 689; *Cty. of Orange*, 262 F.3d at 1023. Joinder on this basis would be improper.

Nonetheless, the Court has concerns about leaving Kitsap County and other government entities out of this case for other reasons. If Defendants' clients independently decide whether inmates are given a choice between release cards and other forms of reimbursement, the Court may be unable to fashion adequate injunctive relief in their absence. *See Peabody*, 610 F.3d at 1081. It is also possible that an injunction would impose inconsistent obligations on Defendants, who would be ordered to reform their practices while still contractually bound to provide the same services to government clients. *See id.* at 1082 (requiring joinder where Defendants would be caught "between the proverbial rock and a hard place"); *see also Kizer v. PTP, Inc.*, 129 F.

---

[2] In *E.E.O.C. v. Peabody Western Coal Co.*, the Ninth Circuit held that the absent Secretary of the Interior was a necessary party that had to be joined despite the fact that he did not himself claim an interest in the case. 610 F.3d 1070, 1081-82 (9th Cir. 2010). However, *Peabody* found that both of Rule 19(a)(1)'s requirements were met, and Rule 19(a)(1)(A) does not require the absent party to claim anything. 610 F.3d at 1081. *Peabody*'s conclusion that joinder was required despite the Secretary's inaction is thus consistent with other Ninth Circuit precedent requiring the absent party to claim an interest. To the extent that *Linehan v. Allianceone Receivables Mgmt., Inc.*, cited by Defendants, reached a different conclusion, the Court disagrees with that case. No. C15-1012-JCC, 2016 WL 4765839, at *9 (W.D. Wash. Sept. 13, 2016).

Supp. 3d 1000, 1011 (D. Nev. 2015) (same). It would be a waste of time to certify the national

class only to decertify it because there are indispensable parties that cannot feasibly be joined.

The Court will therefore reserve the issue of Rule 19 joinder and have the parties address it at

oral argument.

b.    *Due Process*

Defendants' arguments concerning due process are scattershot, but they seem to contend

that Reichert's claims implicate an unnamed government defendant class that stands to lose if not

joined. *See Duerre v. Hepler*, 892 N.W.2d 209, 216 (S.D. 2017); *Adler v. Ogden Cap Properties*,

LLC, 42 Misc. 3d 613, 615, 627 (Sup. Ct. 2013); *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of*

*Illinois, Inc.*, 97 F.R.D. 668, 674 (N.D. Ill. 1983); *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283,

291 (N.D. Cal. 1978). But Reichert did not sue an ambiguous class of government defendants;

Reichert sued Keefe, Rapid, and Cache Bank. While injunctive relief may impact agencies'

practices for releasing inmates, it is not yet clear that an effective injunction would necessarily

*order* government entities to do anything. There is thus no defendant class here and the due

process interests of government entities are not implicated.

## CONCLUSION

Reichert's Motion for Class Certification [Dkt. #69] is GRANTED with respect to the

Washington subclass on the condition that Reichert add another named plaintiff who received a

cardholder agreement with their release card.

Certification of the national class and necessary joinder under Rule 19 are RESERVED.

Oral argument will be set for Thursday, May 23, at 1:30 p.m. The parties should be prepared to

discuss (1) whether the law of different states regarding contract formation and duress is

sufficiently consistent to allow certification of the national class, and (2) whether joinder of

absent government entities is necessary under Rule 19 to ensure that the Court can accord

complete relief and avoid imposing inconsistent obligations.

IT IS SO ORDERED.

Dated this 8th day of May, 2019.


Ronald B. Leighton
United States District Judge