UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JEFFREY REICHERT and GARY MOYER, both individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KEEFE COMMISSARY NETWORK LLC, d/b/a ACCESS CORRECTIONS; RAPID INVESTMENTS, INC., d/b/a RAPID FINANCIAL SOULTIONS, d/b/a ACCESS FREEDOM; and CACHE VALLEY BANK<br><br>Defendants. | CASE NO. C17-5848 BHS<br><br>ORDER DENYING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION |

This matter comes before the Court on Defendant Keefe Commissary Network, LLC's motion to compel arbitration of Plaintiff Gary Moyer's claims, Dkt. 134, and Defendants Rapid Investments, Inc. and Cache Valley Bank's related motion to compel arbitration of Moyer's claims, Dkt. 136. The Court has considered the motions and the briefing filed in support of and in opposition to the motions and the remainder of the file and hereby denies the motions for the reasons stated herein.

# I. BACKGROUND

## A. Overview

When people are arrested and detained, detention facilities confiscate their cash and hold it in trust. Facilities traditionally returned the money upon release in cash or with a check. Increasingly, private companies contract with facilities to convert the money into prepaid debit cards ("release cards") and shift administrative costs to the releasee through fees. Releasees often lose a substantial portion of their funds to fees, and some lose their entire balance.

Kitsap County Jail contracts with Keefe to convert cash into release cards. The cards are issued by Cache Valley and Rapid pursuant to the contract between Keefe and Kitsap County. Releasees receive the cards already activated and already accruing fees. Plaintiffs represent a Washington State and a national class of individuals subject to these practices.

Defendants contend that when releasees receive the card, they enter a contractual relationship articulated in a Cardholder Agreement, which includes a binding individual arbitration clause. Plaintiffs counter that no contractual relationship is formed—Defendants provide no consideration, and releasees do not assent to be bound.

## B. Procedural History

The original class representative, Jeffrey Reichert, did not receive any documentation along with his release card. Dkt. 53 at 2. Defendants moved to compel arbitration, arguing that Reichert was bound by the Cardholder Agreement available

through the website listed on the back of his card. *Id*. The Court denied the motion, finding no mutual assent, and thus no contractual relationship. *Id*. at 5.[1]

As a condition of certifying the classes, the Court required Plaintiffs to name an additional class representative who received a copy of the Cardholder Agreement. Dkt. 94. Plaintiffs named Moyer. Dkt. 100. Defendants moved to compel arbitration of Moyer's claims, which the Court denied. Dkt. 116. The Court concluded that though Moyer received a copy of the Cardholder Agreement, he did not assent to enter a contractual relationship. *Id*.

Defendants appealed, and the Ninth Circuit vacated and remanded without "express[ing] any views on whether a valid, enforceable agreement exists." *Reichert v. Rapid Investments, Inc.*, 826 F. App'x 656, 658 (9th Cir. 2020). The Circuit instructed the Court to inquire into Moyer's intent, as distinguished from Reichert's, to determine whether he had in fact assented to the terms of the Agreement. *Id*. at 657 (quoting *City of Everett v. Sumstad's Estate*, 95 Wn.2d 853, 855 (1981)). It emphasized that the record lacked a declaration from Moyer, making it unclear whether the Court considered the parties' "outward manifestations and circumstances surrounding the transaction." *Id*. (quoting *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 50 (2020)).

On February 12, 2021, Defendants again moved to compel Moyer to individually arbitrate his claims. Dkts. 134, 136. Keefe is not a party to the purported contract

---

[1] The Honorable Ronald B. Leighton presided over this case from its filing through August 31, 2020. Dkt. 124. It was transferred to the undersigned following Judge Leighton's retirement from the federal bench.

between Rapid and Moyer, so its motion is based on principles of equitable estoppel, agency, and third-party beneficiary status. Dkt. 124. On March 8, 2021, Moyer responded to both motions. Dkts. 139, 142. On March 12, 2021, Defendants replied. Dkts. 143, 144.

The record now contains both Moyer's declaration and his deposition.

**C.      Factual Background**

Moyer received release cards on three occasions: May 2017, December 2017, and February 2018. Moyer declares that he never applied for the cards or requested any way of getting his money back other than cash. Dkt. 140, ¶ 6. He never agreed to receive the cards instead of his cash. *Id*. ¶ 7.

Rapid glues the card to a Cardholder Agreement "tri-folded around the release card with only the bar code on the back of the release card visible through a cutout of the Cardholder Agreement that allows the correctional facility to scan the release card to assign it to an individual." Dkt. 137, ¶ 12. Rapid began introducing this practice to the detention facilities it works with in April 2017. *Id*. It is undisputed that Moyer received a Cardholder Agreement on at least one occasion.

On May 15, 2017, Moyer was issued a release card loaded with $14.62. *Id.* ¶ 24. He believes he was given a document along with this card but does not specifically remember looking at it. Dkt. 138-1 at 21. He attempted a transaction with Telmate that same day for $13.30 which failed. Dkt. 137, ¶ 25. Three days later, Rapid charged a $1.32 maintenance fee. Dkt. 137-3 at 3. Five days later, Moyer made a $9.49 transaction at a 7-Eleven. Dkt. 137, ¶¶ 25–26. Rapid charged $3.81 in maintenance fees over the next two weeks, and Moyer made no further transactions. Dkt. 137-3 at 3.

On December 15, 2017, Moyer was issued a release card loaded with $40.00. Dkt. 137, ¶ 21. He testified initially that he assumes that he was given a document with this card, but does not specifically remember looking at it, and does not remember whether he had any conversation with the Kitsap County guard. Dkt. 138-1 at 22, 38. Later in his deposition, he testified that if he said anything to the guard, it would have been that he "had trouble with getting money off the card." *Id.* at 39. He also testified that he recalls the guard saying that they do not issue checks anymore, which he assumes was in response to his request for a check. *Id.* at 55. Rapid charged a $2.50 maintenance fee three days after issuing the card. Dkt. 137-3 at 2. Moyer engaged in a $20.00 transaction at an ExxonMobil two days after that. Dkt. 137, ¶ 22. Rapid charged $17.50 in maintenance fees over the next month and a half, and Moyer made no further transactions. Dkt. 137-3 at 2.

On February 8, 2018, Moyer was issued a release card loaded with $95.26. Dkt. 137, ¶ 18. He declares that this card was accompanied by a document, and he "understand[s] that the defendants claim it was an agreement for using the card." Dkt. 140, ¶ 8. However, he "did not agree to any terms or conditions for the return of my money." *Id*. He declares that "I simply wanted my money back. I did not keep a copy of that document." *Id*. He withdrew $80 from an ATM the day he received the card, Dkt. 137, ¶ 19, and was charged a $2.95 issuer fee, Dkt. 137-3 at 2. Rapid charged $12.31 in maintenance fees over the next month, and Moyer made no further transactions. *Id*.

One of the release cards is reproduced below.



On the front, the release cards state "ATTENTION! This card has already been activated!" Dkt. 104-1.[2] On the back, the cards list a website, www.accessfreedomcard.com, and state:

> By accepting and or using this card, you agree to the Account Agreement. Get cash and/or make purchase where you see these logos. For your protection, do not write your personal identification number (PIN) on this card. This card is issued by Cache Valley Bank pursuant to a license by MasterCard International. Customer Service Toll Free 877-592-1118

*Id.*

Rapid used two versions of its Agreement during the relevant period—one effective June 2016 and one effective February 2018. Dkt. 137-1 at 2; Dkt. 137-2 at 2.

---

[2] The pre-activation and listed PIN raise the additional question of whether a reasonable person would leave money behind in such an unsecured form.

ORDER - 6

The record does not conclusively establish which version Moyer received with his February 8, 2018 release card, and Moyer questions whether Kitsap County would have already started distributing the February 2018 version of the agreement by February 8, 2018. Dkt. 139 at 23 n.5.

The Agreements' appearance is substantially similar, and the first version of the Agreement is reproduced below.[3]

[Image of Cardholder Agreement document]

---

[3] When presented to the releasee, the Agreement appears on a single page.

ORDER - 7

[image of Cardholder Agreement text with Card Fees table]

Each Agreement states at the outset:

> This Cardholder Agreement (this "**Agreement**") sets forth the terms of your non-reloadable prepaid Card. Please read it carefully and retain it for your records. If you do not agree to these terms, do not use the Card and cancel it by calling Customer Service at 1-877-287-2448. Otherwise, your acceptance and/or use of the Card will be evidence of your agreement to these terms.

Dkt. 137-1 at 2; Dkt. 137-2 at 2. The next clause states:

> NOTE: THIS AGREEMENT REQUIRES CERTAIN DISPUTES TO BE RESOLVED BY WAY OF **BINDING ARBITRATION**, RATHER THAN BY JURY TRIAL. THE TERMS OF THE ARBITRATION CLAUSE APPEAR AT THE END OF THIS AGREEMENT.

Dkt. 137-1 at 2; Dkt. 137-2 at 2. The arbitration provision, which appears in the middle of the right column of text, states in part:

> Except as expressly provided below, any controversy that arises out of or is related to (a) the Card, (b) any service relating to the Card, or (c) this Agreement, whether based on statute, contract, tort, or any other legal theory, in which the aggregate amount in controversy for all claimants exceeds $15,000, including interest and attorneys' fees, (any "Claim") will be settled on an individual basis by binding arbitration under the Federal Arbitration Act ("FAA").

Dkt. 137-2 at 2; Dkt. 137-3 at 2. In apparent contradiction, a preceding provision, "Governing Law/Jurisdiction," states:

> All matters . . . relating to the validity, construction, interpretation or enforcement of this Agreement shall be determined by the laws of the United States . . . . You consent and submit to the exclusive jurisdiction of the state and federal courts located in Cache County, Utah in all controversies arising out of or in connection with your use of the Card and this Agreement.

Dkt. 137-2 at 2; Dkt. 137-3 at 2.

The earlier version of the Agreement listed the fee to "Close Account with Check Disbursement" as $10.00. Dkt. 137-1 at 2; Dkt. 137-2 at 2. Rapid's Managing Partner, Daren Jackson, declares that Rapid did not in fact assess this fee when releasees requested checks. Dkt. 137, ¶ 8. The later version of the Agreement has a "Consent" provision which states:

> Individuals who believe they have received this card non consensually [sic] will be entitled to full refund of any fees charged to the card. Individuals can claim their full balance by visiting dailypay.me or calling the number on the back of the card.

Dkt. 137-2 at 2.

## II. DISCUSSION

Moyer contends that he cannot be forced to arbitrate his claims because he never entered a contractual relationship with Defendants. Defendants counter that his receipt of their Cardholder Agreement and use of the release cards formed a contract.

"Issues regarding the *validity* or *enforcement* of a putative contract mandating arbitration should be referred to an arbitrator, but challenges to the *existence* of a contract as a whole must be determined by the court prior to ordering arbitration." *Sanford v.*

*Member Works*, 483 F.3d 956, 962 (9th Cir. 2007) (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140–41 (9th Cir. 1991)) (footnote omitted) (emphasis in original). The party seeking to compel arbitration has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal.4th 394, 413 (1996)).

"To determine 'whether a valid agreement to arbitrate exists,' *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000), [courts] apply 'ordinary state-law principles that govern the formation of contracts[,]' *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014)." *Reichert*, 826 Fed. App'x at 657 (citation omitted). The parties agree that Washington law applies. *Id*. at 657 n.1.

"'If there is doubt as to whether [an agreement to arbitrate] exists, the matter should be resolved through an evidentiary hearing or mini-trial . . . . When considering a motion to compel arbitration which is opposed on the grounds that there is no binding agreement to arbitrate, the district court should give the opposing party the benefit of all reasonable doubts and inferences that may arise.'" *Garbacz v. A.T. Kearny, Inc.*, No. C 05-05404 JSW, 2006 WL 870690, at *2 (N.D. Cal. Apr. 4, 2006) (quoting *McCarthy v. Providential Corp.*, No. C 94-0627 FMS, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994)).

**A.  Consideration**

Though the Ninth Circuit's remand focused on mutual assent, Moyer also contends that contract formation fails for lack of consideration. First, Moyer argues

Defendants had a preexisting legal duty to return his money, so any promise to do so is not consideration. Dkt. 139 at 13–14. Second, he argues that a release card is not equivalent to the funds he was entitled to receive because fees deplete the card's value. *Id.* at 14 (citing *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 575 (9th Cir. 2020)). Defendants counter that the consideration Moyer received is the services and features associated with the card, rather than the return of his money. Dkt. 144 at 3.[4] Upon examination, the points the parties raise collapse into the mutual assent analysis.

"Consideration is 'any act, forbearance, creation, modification or destruction of a legal relationship, or return promise given in exchange.'" *Labriola v. Pollard Grp.*, 152 Wn.2d 828, 833 (2004) (quoting *King v. Riveland*, 125 Wn.2d 500, 505 (1994)). "Consideration is a bargained-for exchange of promises." *Id.* (citing *Williams Fruit Co. v. Hanover Ins. Co.*, 3 Wn. App. 276, 281 (1970)).

Defendants are correct that courts "generally do not inquire into the adequacy of consideration." *Id.* at 834 (citing *Browning v. Johnson*, 70 Wn.2d 145, 147 (1967). If Moyer in fact assented to receive a card with services and features, those services and features could constitute consideration for Moyer's agreement to forgo his right to a jury

---

[4] Defendants also argue the Court should follow *Allbaugh v. Perma-Bound*, No. C088-5713-JCC, 2009 WL 10676437, at *7 (W.D. Wash. Aug. 14, 2009). There, the Court found a modification to an employment contract was supported by consideration because "[t]he arbitration agreement contains an exchange of promises such that both parties for the first time agreed to waive their right to a jury trial to resolve disputes between them." *Id. Allbaugh* is distinguishable and persuasive authority only. Unlike Moyer, the plaintiff negotiated terms of the agreement and signed it (albeit under duress). *Id.* at 2. Moreover, *Allbaugh* relied on *Labriola*, where the Washington Supreme Court held that modification to an employment relationship requires independent consideration such as "continued employment and/or continued training," rather than a "mutual" promise to give up rights. *Labriola*, 152 Wn.2d at 838.

trial and abide by Defendant's fee schedule. However, that construction of consideration depends on a conclusion that Moyer assented to receive the card's features.

**B.     Illegality**

Moyer also contends that he cannot be compelled to arbitrate because the agreement is void as illegal under the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693–1693r, because the cards are not voluntarily requested and because the fees are not permissible. Dkt. 139 at 7 (citing *Brown*, 953 F.3d at 569). He contends that, even if the contract was permitted under state law, the EFTA preempts state law and a contract that is illegal is null from the beginning and unenforceable. Dkt. 139 at 28 (quoting *In re Marriage of Hammack*, 114 Wn. App. 805, 810–11 (2003)).

However, the Supreme Court distinguishes challenges to the agreement to arbitrate, such as argument that state law prohibits arbitration of certain claims, from challenges to the whole contract "either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders to the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). It held that arguments that the entire contract is illegal and void *ab initio* remain subject to an arbitration clause "unless the challenge is to the arbitration clause itself." *Id*. at 445–46. Otherwise, a court would be permitted "to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Id*. at 448–49.

Moyer's challenge is not directed to the arbitration clause itself—it squarely challenges the entire contract. Therefore, if a contract was formed, Moyer's claims

remain subject to the arbitration clause despite his contention that the entire contract is illegal and void *ab initio*.

C.   **Mutual Assent**

Moyer argues that he did not assent to anything when he took the card to get his own money returned. Dkt. 139 at 15. He argues that he negotiated nothing, made no statement of acceptance, and had no duty to object to the unrequested card. *Id*. at 15–16. Defendants counter that Moyer could have rejected the contractual relationship by calling customer service to request a check for the balance of his card, and his "ability to decline [the release card] shows the voluntary nature of his assent." Dkt. 144 at 6.

To determine mutual assent to contract, the Court must assess Moyer's intent "based on 'the reasonable meaning of [his] words and acts'—to assent to the terms of the Agreement." *Reichert*, 826 Fed. App'x at 658 (quoting *City of Everett*, 95 Wn.2d at 855). Relevant facts are Moyer's "'outward manifestations'" and the "'circumstances surrounding the transaction[s].'" *Id.* (quoting *Burnett*, 196 Wn.2d at 50).

The record evidence of Moyer's outward manifestations and the surrounding circumstances is sparse. As noted, it is possible that Moyer received a Cardholder Agreement with each card. It is undisputed at a minimum that he received an Agreement with his February 2018 card, so the Court focuses its analysis on that interaction.

Moyer received a release card from Kitsap County Jail on February 8, 2018. The card was credited with $95.26 at 9:00 p.m., Dkt. 137-3 at 2, and was accompanied by a Cardholder Agreement, most likely tri-folded around the card, *see* Dkt. 137, ¶ 12. As noted, the card's sticker announced that it had already been activated, and the card stated

1 "[b]y accepting and or using this card, you agree to the Account Agreement," Dkt. 104-1, while the Cardholder Agreement stated "[i]f you do not agree to these terms, do not use the Card and cancel it by calling Customer Service at 1-877-287-2448. Otherwise, your acceptance and/or use of the Card will be evidence of your agreement to these terms." Dkt. 137-1 at 2; Dkt. 137-2 at 2.

Moyer recalls telling a guard that they should return to issuing checks because he could never get all his money back from the cards. Dkt. 138-1 at 37. The guard told him that if he wanted his money back "that's what I was going to do to get it back, take that card." *Id*. There is no evidence of any further conversation. At 10:18 p.m., Moyer withdrew $80.00 from an ATM and incurred a $2.95 fee. Dkt. 137-3 at 2; Dkt. 137, ¶ 19. The card balance was entirely depleted by fees by March 11, 2018, Dkt. 137-3 at 2.

The Court continues to conclude that Moyer's use of the card did not constitute assent to contract. Under Washington law, "an offeree has a right to make no reply to offers, and his silence in an action cannot be construed as assent to the offer." *Roethemeyer v. Milton*, 177 Wash. 650, 658 (1934). "And the courts hold that even though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offeror cannot prescribe conditions so as to turn silence into acceptance." *Id*. While Defendants contend that they only consider a contractual relationship formed upon use of the card, the contractual language says otherwise—the card states that "[b]y accepting or using this card, you agree," and the Agreement instructs the recipient to call to cancel, otherwise acceptance or use of the card is evidence of agreement. Had Moyer taken the card to the nearest telephone and

called to cancel his card, he would have already "accepted" it—he would have taken it from the Kitsap County guard into his possession. Unless Moyer left his money behind, on Defendants' activated card, leaking money to Defendants' fees, the Court is entirely skeptical that Defendants would not contend he had entered a contractual relationship.

Just like in *Brown v. Stored Value Cards*, No. 3:15-cv-01370-MO, 2016 WL 755625, at *4 (D. Or. Feb. 25, 2016), Moyer was required to take the card when leaving jail if he wanted a return of his money, and had to work through Defendants' systems, whether by telephone or online, to get it back. And like the plaintiff in *Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357, 1264 (N.D. Ga. 2015), *aff'd* 608 F. App'x 895 (11th Cir. 2015), Moyer made no application for the card, was not offered a line of credit he could choose to use, and did not use the card for a long period of time or make payments on it (though he did received the Cardholder Agreement), so analogies to cases involving consumer-initiated transactions where the plaintiff failed to read terms are inapposite. Critically, though, like the plaintiff in *Regan*, he "received the Card while he was being discharged *from jail, i.e. from a condition of absence of liberty of choice which Defendant reasonably could have anticipated.*" *Id.* (emphasis in original). The district courts in *Brown* and *Regan* found disputes of fact on acceptance. The plaintiff in *Brown* understood she could reclaim her money by creating an online account but did not wish to engage with the unknown defendant bank, 2016 WL 755625, at *3–4. The contractual language in *Regan* stated that use constitutes acceptance, but the plaintiff was not aware of the language, was minimally familiar with ATM cards, and unsuccessfully attempted to retrieve his funds through his bank before using the card. 85 F. Supp. 3d at 1361.

While the courts in *Brown* and *Regan* found questions of fact on acceptance requiring a trial on the issue of arbitrability, the Court does not find a question of fact in this case. Here, the cards clearly state that acceptance constitutes agreement, so there was no way for Moyer to leave the jail with the card and work through Defendants' instructions for reclaiming his funds without being bound to individual arbitration.

Unlike the plaintiff in *Pope v. EZ Card & Kiosk LLC*, Case No. 15-61046-CIV-MARRA, 2015 WL 5308852, at *2 (S.D. Fla. Sept. 11, 2015), who signed a form telling the jail he preferred a card over a mailed check and was compelled to arbitrate, Moyer signed nothing and had no opportunity to avoid Defendants at the point of departure from jail. And unlike the plaintiff in *Reyes v. JPay, Inc., et al.*, No. CV 18-315-R, 2018 WL 10811497 (C.D. Cal. June 26, 2018), who could at least avoid a contractual relationship by refraining from using the card while he attempted to cancel it, Moyer lacked even that option.

The Court agrees with Moyer that this case should be governed by the Ninth Circuit's decision in *Knutson*. In *Knutson*, the plaintiff purchased a Toyota truck which came with a pre-activated trial subscription to Sirius XM radio. 771 F.3d at 563. The customer agreement followed in the mail. *Id.* at 555. The plaintiff did not read the agreement and continued to use the subscription. *Id.* The Ninth Circuit reasoned that the plaintiff had no reason to act to cancel the relationship when "[h]e was, as far as he knew, only in a contractual relationship with Toyota. A reasonable person in [the plaintiff's] position could not be expected to understand that purchasing a vehicle from Toyota

would simultaneously bind him or her to any contract with Sirius XM, let alone one that contained an arbitration provision without any notice of such terms." *Id*. at 566.

Moyer, as far as he knew, was simply getting his money back when he left jail. A reasonable person in Moyer's position could not be expected to understand that he could not leave jail with his own money, a right protected by Washington law, without being bound to a contract with an unknown bank (subject to potentially illegal fees) and renouncing his right to sue or bring a class action. "Accepting" one's own money, in the only form available, cannot be construed as assent to contract. To decide otherwise would violate the offeree's right to make no reply to an offer. *Roethemeyer*, 177 Wash. at 658.

The Court thus concludes that Defendants have not met their burden to show by a preponderance of the evidence that an agreement to arbitrate exists. *Knutson*, 771 F.3d at 565. Defendants' motion to compel arbitration is DENIED.

**D.     Keefe's Motion**

As Moyer formed no contractual relationship with Rapid and Cache Valley, there is no contractual arbitration provision for Keefe to enforce. Therefore, Keefe's motion to compel arbitration is DENIED.

## III.  ORDER

Therefore, it is hereby **ORDERED** that Rapid and Cache Valley Bank's motion to compel arbitration, Dkt. 136, is **DENIED**, and Keefe's motion to compel arbitration, Dkt. 134, is also **DENIED**.

Dated this 2nd day of June, 2021.

BENJAMIN H. SETTLE
United States District Judge